UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

```
                                   .
The United States of America,.    Docket #CR-14-583 (EGS)
                                   .
            Plaintiff,             .
                                   .    United States Courthouse
               vs.                 .    Easton, PA
                                   .    October 30, 2015
Corderro Cody,                     .    10:28 a.m.
                                   .
            Defendant.             .
.......................................................
```

TRANSCRIPT OF CHANGE OF PLEA
BEFORE THE HONORABLE EDWARD G. SMITH
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For The Plaintiff:                 Sherri A. Stephan, Esq.
                                   U.S. Attorney's Office
                                   615 Chestnut St.-Ste. 1250
                                   Philadelphia, PA 19106

                                   Anita Channapati, Esq.
                                   U.S. Department of Justice
                                   Civil Rights Division
                                   601 D. Street, NW, Rm. 5200
                                   Washington, DC 20004

                                   Stephanie Snyder, Esq.
                                   Department of Homeland
                                   Security

For The Defendant:                 Maranna J. Meehan, Esq.
                                   Defenders Association of
                                   Philadelphia
                                   The Curtis Center-Ste. 540
                                   601 Walnut Street
                                   Philadelphia, PA 19106

Catherine C. Henry, Esq.
Federal Community Defender
Office-EDPA
The Curtis Center-Ste. 540
601 Walnut Street
Philadelphia, PA 19106

Audio Operator                Jaime Kulick

Transcribing Firm:            Writer's Cramp, Inc.
                              63 Dakota Drive
                              Hamilton, NJ 08619
                              609-588-8043

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

3

## Index

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|

**Witnesses For The Plaintiff:**

**Witnesses For The Defendant:**

**EXHIBITS:** **Marked** **Received**

**SUMMATION BY:**

**THE COURT:** Finding          64

1          THE CLERK:  All rise.  The United States District

2   Court for the Eastern District of Pennsylvania is now in

3   session, the Honorable Edward G. Smith presiding.

4          THE COURT:  Good morning.  You may be seated.  Thank

5   you.

6          ALL:  Good morning, Your Honor.

7          THE COURT:  The Court is called to order in the

8   matter of The United States v. Corderro Cody.  This is

9   Criminal Action #14-583.  Present in the Courtroom is the

10   Defendant, Mr. Cody.  He is assisted by his counsel, attorneys

11   Maranna Meehan and Attorney Catherine Henry.

12          ALL:  Good morning, Your Honor.

13          THE COURT:  Good morning.  On behalf of The United

14   States appears Assistant United States Attorney Sherri

15   Stephan.  She is joined by Stephanie Snyder of Homeland

16   Security and Anita Channapati, from the Department of Justice.

17   Good morning.

18          ALL:  Good morning, Your Honor.

19          THE COURT:  Now, Mr. Cody, is that screen there, is

20   that interfering with your ability to easily see up here?

21          MR. CODY:  I can see you, though.

22          THE COURT:  All right.  If you want to move your

23   chair out a little bit so it's not the problem, feel free to

24   do that.  Sir, the Court convenes today because it's been

25   represented to me that there's been a Plea Agreement reached

1    between you, your counsel, and the United States Attorney, and

2    that you intend to plead guilty to all charges in this case.

3    Is that correct, sir?

4             MR. CODY:  Yes, sir.

5             THE COURT:  Very well, sir.  If you would please

6    stand and raise your right hand to be sworn?

7                  CORDERRO CODY, DEFENDANT, SWORN

8             THE COURT:  Thank you very much, sir, you may be

9    seated.  And, Mr. Cody, I want to make sure that in front of

10   you you have a copy of the Second Superceding Indictment,

11   which includes the charges in this case.  Do you have one of

12   those?

13            UNIDENTIFIED SPEAKER:  No, Your Honor.  We don't

14   have that.  We just have the Guilty Plea Agreement, the

15   Government's Change in Plea Memo.

16            THE COURT:  All right.  Does the U.S. Attorney have

17   an extra copy of the Second Superceding Indictment?  If not,

18   we can print one out.

19            MS. STEPHAN:  Unfortunately, Judge, I just have it

20   digitally.  I don't have a copy.  My apologies.

21            THE COURT:  Very well.  No, that's okay.

22            UNIDENTIFIED SPEAKER:  Right, he's reviewed it.  He

23   just doesn't have it.

24            THE COURT:  All right, we're going to get one in any

25   case.  Even though it's the least important of the documents

1    to have in front of you, you certainly need the Government's

2    Change of Plea Memorandum.  Do you have a copy of that?

3              UNIDENTIFIED SPEAKER:  Yes, Your Honor.

4              THE COURT:  And, sir, you also have a copy of the

5    Guilty Plea Agreement?  And, Mr. Cody, have you signed those

6    documents?

7              MR. CODY:  Yes.

8              THE COURT:  Okay.  Now the purpose of this colloquy

9    we're going to go through is to make sure that you understand

10   the meaning and effect of your guilty pleas, and also that

11   you're pleading guilty knowingly and voluntarily.  Do you

12   understand that?

13             MR. CODY:  Yes, sir.

14             THE COURT:  Now, sir, you've been sworn.  Do you

15   understand that you are now under oath and if you answer any

16   question falsely, your answer could later be used against you

17   in a prosecution for perjury or making false statements?

18             MR. CODY:  Yes, sir.

19             THE COURT:  If I say anything that you do not

20   understand, I want you to interrupt me and ask me to explain

21   it to you and I will be happy to do so.  Do you understand?

22             MR. CODY:  Yes, sir.

23             THE COURT:  Also if you wish to talk to Attorney

24   Meehan or Attorney Henry during the course of this, please let

25   me know and we're going to stop and you'll have the

1    opportunity to talk with them.  And if you want to talk with

2    them privately, we'll take a recess.  Do you understand?

3              MR. CODY:  Yes, sir.

4              THE COURT:  Now have you had enough time to talk

5    with them up until this point that you feel that you fully

6    understand the Plea Agreement and the meaning and effect of

7    that Plea Agreement?

8              MR. CODY:  Yes, sir.

9              THE COURT:  And, counsel, do you both feel as though

10   you've had enough time to discuss this matter with Mr. Cody?

11             MS. MEEHAN:  Yes, Your Honor.

12             THE COURT:  And are you satisfied that he

13   understands all the rights he's giving up by pleading guilty?

14             MS. HENRY:  We sound like we're in stereo, Your

15   Honor.

16             THE COURT:  Certainly.

17             MS. HENRY:  Yes, we both do.

18             THE COURT:  Thank you, Attorney Henry.  And also

19   that he understand the maximum sentence that could be imposed,

20   the mandatory minimum sentence, and the sentence that I would

21   be required to impose if I were to accept the Guilty Plea

22   Agreement?

23             MS. HENRY:  Yes, Your Honor.

24             THE COURT:  And, Mr. Cody, do you agree with all of

25   that?

```
 1              MR. CODY:  Yes, Your Honor.
 2              THE COURT:  Do you have any questions at all at this
 3   point?
 4              MR. CODY:  No, Your Honor.
 5   BY THE COURT:
 6   Q.  Now, sir, would you please state your full name for the
 7   record?
 8   A.  Corderro Asa (phonetic) Cody.
 9   Q.  Now, Mr. Cody, how old are you?
10   A.  I'm 28.
11   Q.  Can you read, write, and converse in English?
12   A.  Yes.
13   Q.  What grade did you go to in school?
14   A.  Eleventh grade.
15   Q.  And where did you go to school, sir?
16   A.  Pius X and William Allen High School.
17   Q.  Is that Pius X up in --
18   A.  Roseto.
19   Q.  -- Roseto?
20   A.  Yes, sir.
21   Q.  Now, sir, have you ever been treated for a drug or alcohol
22   addiction of any sort?
23   A.  No.
24   Q.  Do you have any issues with drugs or alcohol?
25   A.  No.
```

1    Q.  Have you ever been treated for a mental illness of any

2    sort?

3    A.  No.

4    Q.  And, sir, are you currently on any medications,

5    prescription or otherwise?

6    A.  No, sir.

7    Q.  How are you feeling today?

8    A.  Blessed.

9    Q.  And you do feel healthy and you're understanding

10   everything that I'm saying?

11   A.  Yes.

12   Q.  Is there anything that's interfering with your ability to

13   exercise good judgment today?

14   A.  No.

15   Q.  Can you hear and understand me okay?

16   A.  Yes.

17   Q.  Have your lawyers gone over the charges against you and

18   fully explained your trial rights and defenses you could bring

19   to those charges?

20   A.  Yes.

21   Q.  Now, sir, did you voluntarily sign the Plea Agreement and

22   the Acknowledgment of Rights?

23   A.  Yes.

24   Q.  And prior to signing that, did you read the entire

25   document?

1   A.   Yes.

2   Q.   And did you go over that document with your counsel?

3   A.   Yes.

4   Q.   And did they answer any questions that you might have had

5   about the agreement?

6   A.   Yes.

7   Q.   Do you feel that you've had enough time to talk with your

8   lawyers about this agreement?

9   A.   Yes.

10  Q.   And so far have your lawyers done everything you've asked

11  them to do?

12  A.   Yes.

13            THE COURT:  Assistant United States Attorney

14  Stephan, would you summarize the terms of the Plea Agreement?

15            MS. STEPHAN:  Yes, Your Honor.  Defendant's agreeing

16  to plead guilty to all counts in the Indictment, that's counts

17  1 through 15.  Count 1 charges him with one count of

18  conspiracy to commit sex trafficking by force, fraud, or

19  coercion in violation of Title 18 of the United States Code

20  Section 1594(c).  One count of conspiracy to transport women

21  interstate for commercial sex acts in violation of Title 18

22  U.S.C. 371.  12 counts of sex trafficking by force, fraud, or

23  coercion or attempt in violation of Title 18 U.S.C. Sections

24  1591 and 1594.  And one count of sex trafficking of a minor in

25  violation of Title 18 Sections 1591 and 1594 as well.

1    He agrees not to contest forfeiture.  At the time of

2    sentencing, he understands the Government will make whatever

3    sentencing recommendations that are appropriate pursuant to

4    paragraph 5 of the Plea Agreement and comment on the evidence

5    and circumstances of the case as appropriate.  He also

6    understands that nothing in this agreement shall limit the

7    Government in its comments in their responses to any post-

8    sentencing matters.

9    He understands and agrees and it has been explained to

10   him that the following statutory maximum (indiscern.)

11   sentences apply.  For count 1, conspiring to commit sex

12   trafficking of women by force, fraud, or coercion is a maximum

13   of lifetime, a $250,000 fine, a mandatory minimum of 15 years

14   imprisonment, a mandatory minimum of five years supervised

15   release up to lifetime supervised release, and $100 special

16   assessment.

17   For count 2, conspiring to transport an individual

18   interstate for purposes of prostitution is up to five years

19   imprisonment, a $250,000 fine, three years supervised

20   released, and $100 special assessment.

21   For counts 3 through 14, sex trafficking by force, fraud,

22   or coercion, or attempt, he facing a maximum of lifetime

23   incarceration, a mandatory minimum of 15 years imprisonment, a

24   $250,000 fine, a mandatory 5 years supervised release up to

25   lifetime supervised release, and a $100 special assessment,

1    all per count.

2         And count 15, sex trafficking of a minor, up to lifetime
3    incarceration, a mandatory minimum of 15 years imprisonment, a
4    $250,000 fine, mandatory minimum of 5 years supervised release
5    up to lifetime supervised release, and a $100 special
6    assessment.

7         That's making his total mandatory minimum and maximum
8    sentence as follows.  Lifetime imprisonment, mandatory minimum
9    15 years imprisonment; a $3,750,000 fine; a mandatory minimum
10   of 5 years supervised release up to a lifetime supervised
11   release; and a $1,500 special assessment.  He understands full
12   restitution also shall be ordered.  And as I stated before,
13   forfeiture may also be ordered.

14        He further understands that if he is given supervised
15   release and he violates and that term is revoke, he can
16   receive up to five years per count of conviction as a penalty.
17   He also understands that if he violates supervised release by
18   committing a specified child exploitation offense, the Court
19   shall revoke supervised release and require him to serve an
20   additional term of imprisonment of at least five years.

21        He understands his plea invokes sexual offender
22   registration requirements.  He understands that paragraph 4 of
23   the Plea Agreement summarizes what his obligations will be.
24   He understands that failure to comply with (indiscern.)
25   regulations will result in penalties, including the

1    possibility of additional offenses per any violation or

2    failure to comply.

3        The parties understand this Plea Agreement is being made

4    pursuant to Federal Rules of Criminal Procedure 11(c)(1)(C)

5    and that the parties are asserting the following specific

6    sentences, the appropriate disposition of this case.  360

7    months imprisonment, that being 30 years; a mandatory minimum

8    five years supervised release up to lifetime supervised

9    release in the discretion of this Court; a fine in the

10   discretion of this Court; and a $1,500 special assessment.  If

11   the Court does not accept this Plea Agreement, than either the

12   Defendant or the Government will have the right to withdraw

13   from the Plea Agreement and insist that the case proceed to

14   trial.

15       If the Court accepts the recommendations of the parties

16   and imposes the sentence in paragraph five, the parties agree

17   that neither will file an appeal or conviction of the sentence

18   in this case.  Further, the Defendant agrees that if the Court

19   proposes the recommended sentence, he voluntarily expressed he

20   waives all rights, (indiscern.) prosecution.  He retains one

21   exception and that is the right to file a Petition for

22   Collateral Relief under Title 28 U.S.C. 2255, asserting only

23   in claim that the attorney representing him at the time of the

24   execution of his agreement and the entry of his guilty plea

25   provided Constitutionally ineffective assistance during any

1    part of that representation.

2        However, he is voluntarily and expressly waiving all

3    rights to file a 2255 petition alleging that the Defense

4    counsel had any conflict of interest in representing him

5    arising from or relating to an alleged letter or

6    correspondence from the Defendant that was delivered to the

7    witness as should be more fully addressed by this Court during

8    the Change of Plea proceedings.

9        The Defendant also understands if the Court does not

10   accept the recommendations of the parties to propose the

11   sentence as seen in paragraph 5, that he -- and he

12   nevertheless decides to enter his guilty plea without

13   objection by the Government, that he is voluntarily and

14   expressly waiving his rights to appeal or collaterally attack

15   his sentence or conviction.

16       Notwithstanding the waiver provision, if the Government

17   appeals, then the Defendant may file a direct appeal.  If the

18   Government does not appeal, then the Defendant has the limited

19   avenues of appeal, including one, that his sentence on any

20   count of conviction has exceeded the statutory maximum for

21   that count that's stated in paragraph 3 of the agreement,

22   challenging a decision by this Judge to pose an upward

23   departure pursuant to the Sentencing Guidelines, challenging a

24   decision by the Sentencing Judge to oppose an upward variance

25   above the final sentencing guideline range, or that an

1   attorney can represent the Defendant during the course of the

2   criminal case provided ineffective assistance of counsel.

3       Once again, however, he is voluntarily and expressly

4   waiving all rights to file a 2255 petition, once again

5   addressing whether counsel had any conflict of interest in

6   representing him arising from or relating to an alleged letter

7   of correspondence from the Defendant and delivered to the

8   witness.  And once again that will be formally addressed in

9   the Court today.

10      If the Defendant does not appeal pursuant to this

11  paragraph, no (indiscern.) by him on direct appeal other than

12  those described in this sub-paragraph.  He's agreeing to pay

13  the fine and to make restitution as directed by this Court.

14  He's agreeing to cooperate in the collection of the financial

15  obligation and agrees to fully disclose all his assets

16  (indiscern.).  He's agreeing to submit a completed financial

17  statement to the U.S. Attorney's Office.  He promises that

18  will be fully accurate and complete.  He is authorizing the

19  U.S. Attorney's Office to obtain a credit report.  And he

20  agrees to pay the special victim witness fees in the amount of

21  $1,500 at such time directed by this Court.

22      There are various stipulations that have been agreed to

23  by the parties.  The parties understand they are not binding

24  on the Probation Department or this Court.  First, the parties

25  agree and stipulate the applicable Sentencing Guideline is

1    found under sentencing -- Section 2(d)(1.1) and his base

2    defense level is a 34.  The parties agree and stipulate there

3    are 12 victims and therefore his base defense level should be

4    increased by five levels.  Parties agree and stipulate he was

5    a leader, a manager of a criminal organization that had more

6    than five participants, and his base level should be increased

7    by four levels.  The parties agree and stipulate the Defendant

8    obstructed justice and therefore his base level should be

9    increased by an additional two levels.  Because he's entered a

10   Plea Agreement, he's entitled to two level down adjustments

11   under Section 3(e)(1.1)sub-section (A).

12        The Defendant understands that if he commits any federal,

13   state, or local crime between the date of this agreement and

14   sentencing then the (indiscern.) void the Plea Agreement and

15   the Government can choose a remedy of backing out of the

16   agreement and the terms of that are expressly related in

17   paragraph 12 of the agreement.  Defendant waives all rights,

18   whether it's served directly or by its representative to

19   receive any records pertaining to this investigation or

20   prosecution, either under the Freedom of Information Act or

21   the Privacy Act.  And he is asserting that he is satisfied of

22   his legal representation provided by his lawyers, that he and

23   his lawyers have fully discussed the Plea Agreement

24   (indiscern.).  He's also representing that the Guilty Plea

25   Agreement contains no additional promises, agreements, or

1   understandings other than those contained within.  And that no

2   additional promises or agreements will be entered into unless

3   in writing and signed by all parties.  Thank you, Your Honor.

4         THE COURT:  Thank you very much, Counselor.  And,

5   Attorney Henry, do you agree that those are the terms of the

6   Plea Agreement?

7         MS. HENRY:  Yes, Your Honor.

8   BY THE COURT:

9   Q.  And, Mr. Cody, did you understand all those terms?  I know

10  you're going through the Plea Agreement as the Assistant

11  United States Attorney was reading the provisions, do you

12  understand all the terms of the Plea Agreement?

13  A.  Yes, sir.

14  Q.  And did you discuss that fully with your counsel?

15  A.  Yes, sir.

16  Q.  Did you have any questions about the Plea Agreement?

17  A.  No, Your Honor.

18  Q.  Now I do just want to spend a little time talking about

19  some of the provisions.  And you have a copy there in front of

20  you?  Okay.  Now the Plea Agreement provides that you are

21  going to plead guilty to all 15 counts of the Indictment and

22  we've now provided you with a copy of the Indictment.  The

23  Plea Agreement also references the Notice of Forfeiture.  If

24  you look at the Indictment, it's on its -- basically it's the

25  last page.  There is -- or the Notice of Forfeiture, I'm

1    sorry.  And the Notice of Forfeiture basically says that you

2    will forfeit to the United States any property, real or

3    personal, that was used or intended to be used in any manner

4    or part to commit or facilitate the commission of the

5    violation of Title 18 United States Code Sections 1591(a) and

6    1594(a) and (c), and any property real or personal

7    constituting or derived from any proceeds that were obtained

8    directly or indirectly as a result of such a violation as

9    charged in this Indictment.  And this is all pursuant to Title

10   18 United States Code Section 1594(d).  Do you understand the

11   Notice of Forfeiture?

12   A.  Yes, Your Honor.

13   Q.  You understand what it means?

14   A.  Yes, Your Honor.

15   Q.  And you also understand as part of this Plea Agreement

16   you've agreed to that forfeiture, do you understand?

17   A.  Yes, sir.

18   Q.  And with respect to these 15 counts that you're pleading

19   guilty to, we're going to go through the elements of each one

20   of those counts in a little bit.  But do you believe you

21   understand the elements of each one of these counts?

22   A.  Yes, Your Honor.

23   Q.  And count one is conspiracy to commit sex trafficking by

24   force, fraud, or coercion in violation of Section 1594(c) of

25   Title 18 United States Code.  Count two is conspiracy to

1    transport women interstate for commercial sex acts in

2    violation of Section 371 of Title 18 United States Code.

3    Counts 3 through 14 are sex trafficking by force, fraud, or

4    coercion or attempt to do so in violation of Sections 1591 and

5    1594 of Title 18 United States Code.  And the reason there are

6    so many counts is each count involves a different woman.  Do

7    you understand that?

8    A.  Yes, sir.

9    Q.  And count 15 is sex trafficking of a minor in violation of

10   Section 1591 and 1594 Title 18 United States Code.  And you

11   understand the elements of that offense as well, correct, sir?

12   A.  Yes, Your Honor.

13   Q.  Now in return for that -- for your pleas, the Government

14   has agreed, together with you and your counsel, that pursuant

15   to the Plea Agreement, I will be bound to impose a sentence of

16   360 months of incarceration.  Do you understand that?

17   A.  Yes, Your Honor.

18   Q.  In addition to that, I would pose a mandatory minimum of

19   five year supervised release up to a lifetime of supervised

20   release, and that's my discretion.  So in addition to 360

21   months of imprisonment, I could also impose a lifetime of

22   supervised release.  Do you understand that?

23   A.  Yes, Your Honor.

24   Q.  Also I could impose a fine in my discretion and you agree

25   that you owe a $1,500 special assessment, do you understand

1   that?

2   A.  Yes, Your Honor.

3   Q.  Now, sir, if I do not accept this Plea Agreement than

4   either you or the Government would have the right to withdraw

5   from the Plea Agreement and insist the case proceed to trial.

6   Do you understand?

7   A.  Yes, sir.

8   Q.  Now if I do accept the recommendations of the parties and

9   impose the sentence that we just were discussing, then both

10   you and the Government agree that you will not file an appeal

11   of the conviction sentence in this case.  You understand

12   you're waiving your right to appeal if I go along with the

13   deal that's been reached in this case, do you understand?

14   A.  Yes, Your Honor.

15   Q.  And that's a direct appeal you've waived completely.  Now

16   with respect to a collateral appeal, you're also voluntarily

17   and expressly waiving your rights to collaterally attack your

18   conviction sentence or any other matter relating to the

19   prosecution.  However, there is one exception.  And that is

20   you retain the right to file a Petition for collateral relief

21   asserting a claim that the attorneys who represented you were

22   in -- at the time of the execution of this agreement an entry

23   of your guilty plea provided Constitutionally ineffective

24   assistance during any part of the representation.  Do you

25   understand that?

1  A.  Yes, Your Honor.

2  Q.  So, essentially, if I accept this Plea Agreement and I

3  impose a sentence in accordance with the agreement, you have

4  given up all rights to appeal, all rights to a direct appeal,

5  and basically all rights to a collateral appeal with the sole

6  exception of the ineffectiveness of your counsel.  Do you

7  understand that?

8  A.  Yes, Your Honor.

9  Q.  So let's talk about your counsel.  Have they done

10  everything you've asked them to do?

11  A.  Yes.

12  Q.  And are you satisfied with the services that have been

13  provided by Attorney Henry and Attorney Meehan.

14  A.  Yes.

15  Q.  They've done everything you've asked them to do?

16  A.  Certainly.

17  Q.  Now you saw in the Plea Agreement there's an issue about

18  you waiving any conflict issue with respect to your counsel.

19  Do you understand what that is all about?

20  A.  Yes.

21  Q.  And we discussed that in an earlier proceeding when the

22  U.S. -- the United States through the Assistant United States

23  Attorney expressed concern about the actions of the

24  investigator for the Federal Defenders Office, correct?

25  A.  Yes.

1    Q.  And you fully understand that whole issue and how it came

2    about?

3    A.  Yes.

4    Q.  Now here's some questions that the U.S. Attorneys

5    requested you be asked that your counsel have agreed to, I

6    believe, is that correct, Attorney -- have both attorneys

7    agreed to these questions?

8              MS. HENRY:  Yes, Your Honor.  They have been

9    provided to us and we have (indiscern.).

10             THE COURT:  Great.  And you've already seen these

11   questions, correct, sir?

12             THE WITNESS:  Yes.

13             MS. HENRY:  And he has a copy before him also, Your

14   Honor.

15             THE COURT:  Very well.

16   BY THE COURT:

17   Q.  Sir, do you understand that under the Constitution of the

18   United States, you have the right to the effective assistance

19   of counsel?  Yes?

20   A.  Yes.

21   Q.  And, sir, do you understand that your right to effective

22   assistance of counsel includes the right to have an attorney

23   represent you with undivided loyalty and free from any

24   conflicts or interests?

25   A.  Yes.

1    Q.  By that, do you understand that you're entitled to have

2    your lawyers pursue this case for your benefit alone and not

3    with any other person's interests in mind?

4    A.  Yes.

5    Q.  Do you understand that your attorneys, Attorney Meehan and

6    Attorney Henry, may have what could be considered a conflict

7    of interest in representing you because of the following, and

8    I'm emphasizing the word "may".  It's because of the following

9    and this has to do with that investigator.  A significant,

10   disputed issue is that a Government witness may claim to have

11   seen a letter written by you and shown by the defense.  This

12   disputed claim regardless of its truth, could make your

13   attorneys potential witnesses in your case.  That is, if it

14   were in your interest to impeach the witness about her

15   testimony concerning the letter, your attorneys could be

16   witnesses to the issues surrounding the letter.  Do you

17   understand that?

18   A.  Yes.

19   Q.  If your attorneys were representing you at a trial, they

20   would not be permitted, as a matter of law, to testify as

21   witnesses for you in order to impeach the Government witness.

22   Thus, they would have to forego that avenue of impeachment.

23   Do you understand that?

24   A.  Yes.

25   Q.  There is also the possibility that the attorneys could

1    choose not to cross-examine the witness on this issue to avoid

2    creating this conflict.  Do you understand that?

3    A.   Yes.

4    Q.   Accordingly, sir, your attorneys could be considered to

5    have an interest in a guilty plea in order to avoid being

6    potential witnesses at your trial.  Likewise, they could be

7    considered to have an interest in a guilty plea so that they

8    would not be accused of failing to effectively cross-examine

9    this witness as vigorously as they might to avoid the witness

10   saying anything about them.  Do you understand that?

11   A.   Yes.

12   Q.   Your attorneys could also be considered to have a conflict

13   because they could be accused of trying to gain favor with the

14   Government and avoid any scrutiny of their conduct in this

15   case, through your entry of a guilty plea, even if they did

16   not do anything wrong.  Do you understand that, sir?

17   A.   Yes.

18   Q.   And, sir, do you also understand what I have just

19   explained to you about potential conflicts of interests?

20   A.   Yes, Your Honor.

21   Q.   And this also -- I think just adding that is that issue of

22   whether the investigator would be called in light of the fact

23   that there was a suggestion by the Government that the witness

24   may have acted improperly, perhaps even criminally, in this

25   matter.  Do you understand that you're waiving anything

1    relating to that issue?

2    A.  Yes, Your Honor.

3    Q.  By pleading guilty here today and doing so with Attorneys

4    Meehan and Henry representing you, do you understand that you

5    are waiving, that is giving up forever, any rights you may

6    have to claim that those attorneys had a conflict of interest

7    in representing you in this case?

8    A.  Yes.

9    Q.  That is, do you understand that you are waiving any right

10   that you may have to claim that your attorneys were

11   ineffective because of this conflict of interest?

12   A.  Yes.

13   Q.  Do you understand that you're giving up any right that you

14   may have to claim that your attorneys were conflicted in

15   representing you, or were ineffective in this regard, whether

16   a right to appeal or collateral attack arises under 18 U.S.C.

17   Section 3742, Section 1291, or 28 U.S.C. Section 2255, or any

18   other provision of law?

19   A.  Yes.

20   Q.  I know I'm reading off all these statutes to you.  That

21   was 18 U.S.C. Section 3742, 28 U.S.C. Section 1291, and 28

22   U.S.C. Section 2255.  Sir, have you discussed these conflicts

23   of interest questions with Attorney Meehan and Attorney Henry?

24   A.  Yes, Your Honor.

25   Q.  Have you discussed them with any other attorney?

1   A.   Yes.

2   Q.   And that was Attorney Sletvold?

3   A.   Yes.

4   Q.   Anybody else?

5   A.   No.

6   Q.   Would you like to discuss these conflicts of interest with

7   another attorney?

8   A.   No.

9   Q.   Do you believe you fully understand what this issue

10  involves, what the conflict is, and are you fully

11  understanding that you are waiving any conflict with respect

12  to your counsel?

13  A.   Yes, Your Honor.

14  Q.   Do you have any questions for me about this, sir?

15  A.   No, Your Honor.

16  Q.   Do you wish to have Attorney Meehan and Attorney Henry

17  continue to represent you in spite of the possible conflicts

18  of interest?

19  A.   Yes.

20  Q.   Do you understand that by agreeing to have these attorneys

21  represent you, your decision is final, and you will never be

22  able to allege in any Court proceeding or Court filing that

23  you've made the wrong decision or were prejudiced because of

24  this?

25  A.   Yes, Your Honor.

1  Q.  And, sir, have you had enough time to consider and make

2  this decision?

3  A.  Yes.

4  Q.  Understanding everything we have discussed here, do you

5  still want to waive the rights we have discussed and continue

6  to have Attorney Meehan and Attorney Henry represent you in

7  this case?

8  A.  Yes.

9  Q.  And getting back to the Plea Agreement now.  There are

10  some other provisions I do want to address, some we have

11  already kind of addressed when we talked about the waiver of

12  your appellate rights.  And the reason we put so much emphasis

13  on the waiver of your appellate rights is that is a very

14  important Constitutional right that you are waiving when you

15  give up your right to appeal.  Do you understand that?

16  A.  Yes, Your Honor.

17  Q.  And you understand that pursuant to this agreement, you're

18  effectively waiving your right to appeal, and you want to do

19  that, sir?

20  A.  Yes.

21  Q.  Now with respect to the maximum sentence that can be

22  imposed in this case, if you look at paragraph 3 of your

23  Guilty Plea Agreement, it provides the following.  That you

24  understand and agree, and it's been explained to you by

25  counsel, that the Court may impose the following statutory

1  maximum and mandatory minimum sentences.  For count 1,

2  conspiring to commit sex trafficking of women by force, fraud,

3  or coercion, the maximum sentence is lifetime incarceration, a

4  $250,000 fine, a mandatory minimum of 15 years imprisonment, a

5  mandatory minimum of 5 years supervised release up to a

6  lifetime of supervised release, and a $100 special assessment.

7  With respect to count 2, conspiring to transport an

8  individual interstate for the purpose of prostitution, the

9  maximum sentence is five years imprisonment, a $250,000 fine,

10  three years supervised release, and a $100 special assessment.

11  With respect to counts 3 through 14, which is sex

12  trafficking by force, fraud, or coercion, or attempt to do so,

13  the maximum sentence is lifetime incarceration, a mandatory

14  minimum of 15 years imprisonment, $250,000 fine, a mandatory 5

15  years supervised release, up to a lifetime of supervised

16  release, and a $100 special assessment for each count.

17  And with respect to count 15, which is sex trafficking of

18  a minor, the maximum sentence is lifetime incarceration, a

19  mandatory minimum of 15 years of imprisonment, a $250,000

20  fine, a mandatory minimum of 5 years supervised release, up to

21  a lifetime of supervised release, and a $100 special

22  assessment.

23  So the total mandatory minimum and maximum sentence that

24  could be imposed with respect to these 15 counts is lifetime

25  of incarceration, a mandatory minimum of 15 years

1    imprisonment, a maximum fine of $3,750,000, a mandatory

2    minimum of 5 years supervised release, up to a lifetime of

3    supervised release, and a $1,500 special assessment.  Also

4    full restitution would also be ordered and forfeiture may also

5    be ordered.  Do you understand the maximum and the mandatory

6    minimum, sir?

7    A.  Yes, Your Honor.

8    Q.  Now you also understand that supervised release may be

9    revoked if its terms and conditions are violated.  When

10   supervised release is revoked, the original term of

11   imprisonment may be increased by up to five years per count of

12   conviction.  Thus a violation of supervised release increases

13   the possible period of incarceration and makes it possible

14   that you will have to serve the original sentence plus a

15   substantial additional period without credit for time already

16   spent on supervised release.  If you violate the supervised

17   release by committing one or more specified child exploitation

18   offenses, the Court will revoke supervised release -- excuse

19   me, revoke supervised release and require you to serve an

20   additional term of imprisonment of at least five years.  Do

21   you understand that, sir?

22   A.  Yes, Your Honor.

23   Q.  Now at paragraph 4 it discusses the Sex Offender

24   Registration and Notification Act and the requirements that

25   you will have to register as a sex offender once you are

1    released from incarceration.  Have you read over this

2    paragraph along with the rest of the agreement?

3    A.   Yes.

4    Q.   And do you understand it's your obligations to register as

5    a sex offender?

6    A.   Yes.

7    Q.   And, of course, of great importance is the paragraph 5,

8    which sets forth the agreement as to the sentence that I must

9    impose.  If I do not impose the sentence, then you may

10   withdraw from this particular Plea Agreement, do you

11   understand?

12   A.   Yes, sir.

13   Q.   And of course, so could the Government.  And that sentence

14   is as follows.  360 months imprisonment, a mandatory minimum

15   of 5 years supervised release up to a lifetime of supervised

16   release, and that's in my discretion, a fine in my discretion,

17   and a $1,500 special assessment.  If I do not accept this Plea

18   Agreement then either the Defendant or the Government will

19   have the right to withdraw from this agreement and insist that

20   the case proceed to trial.  And with respect to paragraph 6,

21   that's where you agree that if I do accept the agreement,

22   you're going to waive your right to appeal, completely waive

23   your right to a direct appeal, and preserve only the

24   effectiveness of your counsel with respect to a collateral

25   appeal.  Do you understand that?

1   A.  Yes, Your Honor.

2   Q.  But again, you're satisfied with your counsel and you

3   believe they are and they have been effectively representing

4   you?

5   A.  Certainly.

6   Q.  Now there's talk, of course, about the -- what if I don't

7   accept this Plea Agreement and what if you still agree to go

8   forward with your plea, then you've still waived most of your

9   appellate rights.  Do you understand that?

10  A.  Yes, sir.

11  Q.  But that's a little bit different.  In that case you've

12  preserved four circumstances when you can still file a direct

13  appeal, and those are as follows.  One, if the Government

14  files an appeal then you're allowed to file an appeal.  But I

15  will tell you it's very rare that the Government files an

16  appeal of a sentence that I've imposed.  Now the second reason

17  would be if I impose a sentence that exceeds the statutory

18  maximum for that count but I'm not going to impose a sentence

19  that exceeds the statutory maximum.  The third reason would be

20  if I impose a sentence that is an upward departure pursuant to

21  the Sentencing Guidelines.  In other words, if I find pursuant

22  to the Sentencing Guidelines, if I can depart upward by

23  increasing your level then you could appeal.  But I don't

24  think that's a very likely situation in this case, sir, since

25  the Sentencing Guidelines, I believe, are going to come out

1   very close to lifetime if they don't come out to lifetime.  Do

2   you understand that?

3   A.  Yes, sir.

4   Q.  The same thing with the fourth reason, which would be an

5   upward variance, but I don't think there's any possibility

6   that I would be imposing upward variance giving a very high

7   likelihood of the recommended sentence.  Do you understand

8   that, sir?

9   A.  Yes, Your Honor.

10  Q.  So essentially with respect to your direct appeal, it's

11  unlikely any one of these four exceptions would apply in your

12  case, so you should go into this plea assuming that if I don't

13  impose the agreed upon sentence, and you still go forward with

14  your plea, you're still waiving your rights to a direct

15  appeal.  Do you understand?

16  A.  Yes, Your Honor.

17  Q.  And you do, also, waive your rights to a collateral

18  appeal, again with the exception that you can raise the

19  effectiveness of counsel, do you understand?

20  A.  Yes, Your Honor.

21  Q.  But you're satisfied with your counsel and they're not

22  ineffective, correct?

23  A.  Yes, Your Honor.

24  Q.  Is there anything about your appeal rights that you don't

25  understand, sir?

1    A.   No, Your Honor.

2    Q.   And there's talk of the Sentencing Guidelines.  Now, of

3    course, the Sentencing Guidelines are important, but in this

4    particular case, you already know what the sentence is if I'm

5    going to go along with this agreement.  And if I don't go

6    along with this agreement, as I said, you have the right to

7    withdraw from the agreement as does the Government.  But under

8    the agreement, you're basically agreeing that the ultimate

9    offense level in this case is going to be a 43.  And do you

10   understand what that means?

11   A.   Yes.

12   Q.   Do you understand how the guidelines -- how that all

13   works.  Have you discussed that with your counsel?

14   A.   Yes.

15   Q.   Do you have any questions for me about that?

16   A.   No, Your Honor.

17   Q.   Of course, paragraph 14 provides that you're satisfied

18   with the legal representation provided by Attorney Meehan and

19   Attorney Henry.  And I assume to the extent Mr. Sletvold also

20   provided some assistance to you, you're very satisfied with

21   his assistance as well?

22   A.   The lawyer?

23   Q.   Yes, sir.

24   A.   Yes.

25   Q.   Okay.  And that your lawyers have fully discussed the Plea

1   Agreement with you and that you are pleading guilty because

2   you admit that you are guilty?

3   A.  Yes, Your Honor.

4   Q.  And finally, sir, with respect to the Plea Agreement, it

5   is agreed that the parties' guilty Plea Agreement contains no

6   additional promises, agreements, or understandings other than

7   those set forth in the written Guilty Plea Agreement and that

8   no additional promises, agreements, or understandings will be

9   entered into unless in writing and signed by all parties.  Do

10  you agree with that provision, sir?

11  A.  Yes, Your Honor.

12  Q.  And do you agree this is the agreement?  There have been

13  no other promises or agreements made with respect to your

14  plea?

15  A.  Yes, sir.

16          THE COURT:  And do counsel all agree with that?

17          ALL:  Yes, Your Honor.

18  BY THE COURT:

19  Q.  And, Mr. Corderro, you have signed this agreement?

20  A.  Yes, Your Honor.

21          THE COURT:  And Attorney Henry and Attorney Meehan,

22  you have also signed the agreement?

23          MS. HENRY:  Yes, Your Honor.

24          THE COURT:  And Assistant United States Attorney

25  Stephan, you have signed the agreement?

1          MS. STEPHAN:  Yes, Your Honor.

2          THE COURT:  And Attorney Channapati, you have signed

3    the agreement?

4          MS. CHANNAPATI:  Yes, Your Honor.

5    BY THE COURT:

6    Q.  And finally with respect to the Acknowledgment of Rights,

7    we're going to go over your rights very shortly, but did you

8    read the Acknowledgment of Rights before you signed it?

9    A.  Yes, Your Honor.

10   Q.  And that is your signature which appears on this document?

11   A.  Yes, Your Honor.

12   Q.  And you have discussed your rights with your counsel

13   before signing this document?

14   A.  Yes, Your Honor.

15   Q.  Do you have any questions for me about the rights you're

16   giving up by pleading guilty?

17   A.  No.

18   Q.  Now, sir, do you understand that no one can guarantee you

19   what sentence you will get from me?

20   A.  Yes.

21   Q.  But you do know that if I don't impose the sentence set

22   forth in the Guilty Plea Agreement, you can withdraw your

23   plea?

24   A.  Yes, Your Honor.

25   Q.  Did anyone use force, violence, or threats to get you to

1   plead guilty?

2   A.  No, Your Honor.

3   Q.  Sir, are you doing this of your own free will?

4   A.  Yes, Your Honor.

5   Q.  Did anyone tell you what to say today or put words in your

6   mouth, so to speak?

7   A.  No, Your Honor.

8   Q.  Do you understand that you are entering a plea to a felony

9   and will be adjudged guilty of a felony which may deprive you

10  of valuable civil rights, such as the right to vote, hold

11  public office, serve on a jury, possess a firearm, or hold a

12  professional license?

13  A.  Yes, Your Honor.

14  Q.  And, sir, you are a United States citizen, is that

15  correct?

16  A.  Yes, Your Honor.

17  Q.  And I ask that because if you were not, you could be

18  deported as a result of this Plea Agreement.  Do you

19  understand that?

20  A.  Yes.

21  Q.  Sir, have you ever been on supervision for a crime before,

22  such as probation, parole, supervised release, or ARD?

23  A.  Yes.

24  Q.  A prior conviction can affect your Guideline Sentencing

25  range, and if you were on supervision when you committed your

1   present offense, your plea of guilty would be an admission

2   that you violated that supervision.  Do you understand?

3   A.  Yes, Your Honor.

4   Q.  Now I've already gone over, I think exhaustively, what the

5   maximum sentence that can be imposed as well as the mandatory

6   minimum.  Do you understand that completely?

7   A.  Yes, Your Honor.

8   Q.  Do you want me to explain that to you any further?

9   A.  No, Your Honor.

10          THE COURT:  And do all counsel agree that I've

11  properly set forth a maximum sentence as well as the mandatory

12  minimum in this case?

13          ALL:  Yes, Your Honor.

14  BY THE COURT:

15  Q.  You also understand the penalties if you were to violate

16  the supervised release?

17  A.  Yes, Your Honor.

18          THE COURT:  Assistant United States Attorney

19  Stephan, is there any claim for restitution in this case?

20          MS. STEPHAN:  It's uncertain now.  (Indiscern.)

21  presented so far, but after a guilty plea, we normally send

22  forms out to see if anybody (indiscern.).

23          THE COURT:  And is there any specificity with

24  respect to the forfeiture?

25          MS. STEPHAN:  At this point in time, we think it's

1    just the cell phones that were seized.

2            THE COURT:  Cell phones that were seized.  Very

3    well.

4            MS. STEPHAN:  Yes.

5    BY THE COURT:

6    Q.  And Mr. Cody, you understand that, correct?

7    A.  Yes, Your Honor.

8    Q.  Now you can also be ordered to pay restitution for harm

9    caused to the victims in this case.  Do you understand that?

10   A.  Yes, Your Honor.

11   Q.  Also the Government is seeking forfeiture of any property

12   used or acquired through this criminal enterprise.  Right now

13   the only thing indicated is the four cell phones.  But

14   forfeiture means the Government wants to take and keep, sell,

15   or destroy property they claimed was used to help commit the

16   crimes in this case, or which was derived from those crimes.

17   Do you consent to that forfeiture, sir?

18   A.  Yes, Your Honor.

19   Q.  Do you understand that these offenses are covered by

20   advisory sentencing guidelines and I will consider those

21   guidelines in sentencing, but I do not have to follow those

22   guidelines?

23   A.  Yes, Your Honor.

24   Q.  A probation officer will prepare a Pre-sentence Report

25   which will set your guideline sentencing range.  If you

1    disagree with the report, this guilty plea is still binding on

2    you, but you can contest the report with the officer and after

3    that with me, if necessary.  The Government can also contest

4    the report.  Do you understand this?

5    A.  Yes, Your Honor.

6    Q.  Do you understand that your attorney and the Government

7    attorney can agree on facts and make recommendations, motions,

8    and requests at sentencing, but I don't have to do what they

9    ask me to do.  Nevertheless, this plea is still binding on you

10   whether or not I agree with their facts and recommendations,

11   or grant their motions and requests, with the exception that

12   you could withdraw your guilty plea if I do not impose

13   sentencing in accordance with the Guilty Plea Agreement.  Do

14   you understand that?

15   A.  Yes, Your Honor.

16   Q.  Do you understand that there is no more parole and you

17   must serve the whole time of any imprisonment you are

18   sentenced to?

19   A.  Yes, Your Honor.

20   Q.  Sir, do you understand that normally you can appeal your

21   sentence to a higher Court, which could modify or set aside

22   the sentence, or order me to re-sentence you.  The Government

23   can also appeal your sentence.  Do you understand that?

24   A.  Yes.

25   Q.  But do you also understand that you have waived your right

1    to appeal for almost all practical purposes as we've

2    discussed.  Do you understand that?

3    A.  Yes.

4    Q.  Do you want me to discuss that with you any further?

5    A.  No.

6    Q.  And you know it's divided between if I accept the Plea

7    Agreement, you've waived all right to direct appeal and all

8    right to collateral appeal with the exception of the

9    effectiveness of counsel.  If I don't accept it, but you still

10   go through with the plea, then you've waived your direct

11   rights with respect to everything, except those four

12   exceptions I explained, and your collateral rights as well,

13   except for effectiveness of counsel.  Do you understand?

14   A.  Yes, Your Honor.

15   Q.  Now, sir, I want to explain certain Constitutional rights

16   that you have.  Do you have any questions up to this point?

17   A.  No, Your Honor.

18   Q.  Do you understand that a plea of guilt is the strongest

19   form of proof known to the law and that on your plea alone,

20   without the Government introducing any evidence, I can find

21   you guilty and all that's left for me to do is sentence you?

22   A.  Yes, Your Honor.

23   Q.  Now, sir, if you do not believe you are guilty, you should

24   not plead guilty for any reason.  And even if you do believe

25   you are guilty, you still have a legal and moral right to

1    plead not guilty and to require the Government to prove its

2    case against you, if it can, by legal and competent evidence

3    beyond a reasonable doubt.  Do you understand that?

4    A.  Yes, Your Honor.

5    Q.  Now, sir, are you pleading guilty because you truly are

6    guilty?

7    A.  Yes, Your Honor.

8    Q.  Do you understand that you are presumed innocent until you

9    are proven guilty by the Government beyond a reasonable doubt?

10   A.  Yes, Your Honor.

11   Q.  Do you understand that you have a right to the assistance

12   of a lawyer at every stage of the proceedings, including

13   before trial, during trial, after trial, and for any appeals

14   to higher Courts.  And if you cannot afford a lawyer, we will

15   appoint one for you, free of charge?

16   A.  Yes, Your Honor.

17   Q.  Do you understand that you have the right to plead not

18   guilty and persist in that plea and have your case tried by

19   either a jury of 12 people or a Judge sitting alone?

20   A.  Yes, Your Honor.

21   Q.  Do you understand that you have the right to a jury of

22   your peers drawn from the residents in the district of this

23   Court and you would get to help select who was on that jury?

24   A.  Yes, Your Honor.

25   Q.  Do you understand that in order to find you guilty, the

1    verdict of the jury must be unanimous.  That means that all 12

2    jurors must agree that you were proven guilty by the

3    Government beyond a reasonable doubt?

4    A.  Yes, Your Honor.

5    Q.  Do you understand that you could obtain a Subpoena or

6    Court Order to make witnesses come to Court and testify during

7    a trial on your behalf?

8    A.  Yes, Your Honor.

9    Q.  Do you understand that if you were found guilty, you could

10   appeal such a finding of guilt to a higher Court, which could

11   set aside or modify the finding of guilty or give you a new

12   trial?

13   A.  Yes, Your Honor.

14   Q.  Do you understand that at a trial, you have the right to

15   confront and cross examine, that is be in the Courtroom and

16   face, see, hear, and question the Government's witnesses

17   against you?

18   A.  Yes, Your Honor.

19   Q.  Do you understand that at a trial, you could present

20   evidence and you alone would decide whether or not to testify

21   as a witness.  If you didn't want to testify, no one could

22   make you testify or hold it against you.  And the Assistant

23   United States Attorney could not comment on or make reference

24   to your failure to testify, and the jury would be advised that

25   they could not draw any adverse inference from your decision

1    not to testify.  Do you understand that?

2    A.  Yes, Your Honor.

3    Q.  Do you understand that by entering this guilty plea, there

4    will be no trial of any sort, and you are giving up all of the

5    rights I just told you about except the right to counsel?

6    A.  Yes, Your Honor.

7    Q.  Do you understand that by entering this guilty plea, you

8    are admitting that you are guilty?

9    A.  Yes, Your Honor.

10   Q.  I'm getting towards the end of the colloquy.  Do you have

11   any questions at this point?  Any questions about your rights

12   and the rights that you're giving up by pleading guilty?

13   A.  No, Your Honor.

14   Q.  Now, sir, I want to explain to you the elements of the

15   offenses to which you are pleading guilty, and then I'm going

16   to have the Assistant United States Attorney set forth the

17   factual basis for the plea.  That is what the Assistant United

18   States Attorney believes she could prove if, in fact, we were

19   to go to trial next week.  Now first with respect to the

20   elements.  They are as follows.

21       With respect to count 1 of the Indictment, which charges

22   that from at least in or about 2009, continuing through in or

23   about May 20th of 2014, in Allentown, Reading, and elsewhere,

24   you agreed or conspired, together with others, to commit the

25   crime of sex trafficking by force, fraud, or coercion, and

1    that to further the objective of the conspiracy, at least one

2    member of the conspiracy committed at least one overt act as

3    alleged in the Indictment.  It is a federal crime for two or

4    more persons to agree or conspire to commit the crime of sex

5    trafficking by force, fraud, or coercion, even if they never

6    actually achieved their objection.  A conspiracy is a kind of

7    criminal partnership.  In order to find you guilty of

8    conspiracy to commit sex trafficking, the Government must

9    prove beyond a reasonable doubt that each of the following

10   four elements were proven.

11       First, that two or more persons agreed to commit the

12   crime of sex trafficking as charged in the Indictment.

13   Second, that you were a party to or a member of the agreement.

14   Third, that you joined the agreement or conspiracy knowing of

15   its objectives and intending to join together with at least

16   one other alleged conspirator to achieve those objectives.

17   That is that you and at least one other alleged conspirator

18   shared a unity of purpose and an intent to achieve a common

19   goal or objective to commit sex trafficking.  And fourth, at

20   some time during the existence of the agreement or conspiracy,

21   at least one of its members performed an overt act in order to

22   further the objective of the agreement.  Now, do you

23   understand the elements of count 1?

24   A.  Yes, Your Honor.

25   Q.  And do you agree that your conduct meets the elements of

1    count 1?

2    A.  Yes, Your Honor.

3    Q.  Now with respect to count 2 of the Indictment, that

4    charges that from at least in or about 2009, continuing

5    through in or about May 20th, 2014, in Allentown, Reading, and

6    elsewhere, you agreed or conspired, together with others, to

7    commit the crime of transportation of women interstate for

8    commercial sex trafficking, and that to further the objective

9    of this conspiracy, at least one member of the conspiracy

10   committed at least one overt act as alleged in the Indictment.

11        Now, as I said, sir, it is a federal crime for two or

12   more persons to agree or conspire to commit a crime.  In this

13   case, the crime of transportation of women interstate for

14   commercial sex trafficking, even if they never actually

15   achieved their objective.  Again, a conspiracy is a kind of

16   criminal partnership, an agreement to commit a crime.  In

17   order to find you guilty of conspiracy to transport women

18   interstate for commercial sex trafficking, the Government must

19   prove beyond a reasonable doubt each of the following four

20   elements.

21        First, that two or more persons agreed to commit the

22   crime of transportation of women interstate for purpose of

23   commercial sex trafficking as charged in the Indictment.

24   Second, that you were a party to or a member of the agreement.

25   Third, that you joined the agreement or conspiracy knowing of

1    its objectives and intending to join together with at least

2    one other alleged conspirator to achieve those objectives.

3    That is that you and at least one other alleged conspirator

4    shared a unity of purpose and an intent to achieve a common

5    goal or objective to commit sex trafficking.  And fourth, at

6    some time during the existence of the agreement or conspiracy,

7    at least one of its members performed an overt act in order to

8    further the objective of the agreement.  Do you understand the

9    elements of count 2 of the Indictment?

10   A.  Yes.

11   Q.  And, sir, do you agree that your conduct meets the

12   elements of this offense?

13   A.  Yes.

14   Q.  Now, sir, with respect to counts 3 through 14, there the

15   Indictment charges you with sex trafficking by force, fraud,

16   or coercion, or attempting to do so.  In order to prove you

17   guilty of sex trafficking, the Government must prove each of

18   the following elements beyond a reasonable doubt.

19       First, that you knowingly transported, or recruited, or

20   enticed, or harbored, or provided, or obtained, or maintained

21   a person by any means.  Second, that you knew that force,

22   fraud, or coercion would be used with respect to this person.

23   Third, that you knew this person would be caused to engage in

24   a commercial sex act.  And fourth, that your conduct was in or

25   affecting interstate or foreign commerce.

1          Now an attempt to commit sex trafficking is a federal

2     crime even if you did not actually complete the crime of sex

3     trafficking.  In order to find you guilty of attempt to commit

4     sex trafficking, the Government must prove beyond a reasonable

5     doubt the following two elements.  First, that you intended to

6     commit the crime of sex trafficking.  And second that you

7     perform an act constituting a substantial step toward the

8     commission of the charged offense, which strongly corroborates

9     or confirms that you intended to commit that crime.  Now, sir,

10    do you understand the elements of counts 3 through 14 of the

11    Indictment?

12    A.  Yes, Your Honor.

13    Q.  And, sir, do you agree that your conduct meets the

14    elements of these offenses?

15    A.  Yes, Your Honor.

16    Q.  And the final element -- or the final charge is count 15.

17    Count 15 of the Indictment charges you with sex trafficking of

18    a minor or attempting to do so.  In order to prove you guilty

19    of sex trafficking of a minor, the Government must prove each

20    of the following elements beyond a reasonable doubt.  First,

21    that you knowingly transported, or recruited, or enticed, or

22    harbored, or provided, or obtained, or maintained a person by

23    any means.  Second, that you knew that person had not obtained

24    the age of 18.  Third, that you knew this person would be

25    caused to engage in a commercial sex act.  And fourth, that

1    your conduct was in or affecting interstate or foreign

2    commerce.

3         An attempt to commit sex trafficking of a minor is a

4    federal crime even if you do not actually complete the crime

5    of sex trafficking.  In order to find you guilty of attempt to

6    commit sex trafficking of a minor, the Government must prove

7    beyond a reasonable doubt the final two elements.  First that

8    you intended to commit the crime of sex trafficking of a

9    minor, and second that you perform an act constituting a

10   substantial step toward the commission of the charged offense

11   which strongly corroborates or confirms that you intended to

12   commit that crime.  Sir, do you understand the elements of

13   count 15?

14   A.  Yes, Your Honor.

15   Q.  And do you agree that your conduct meets the elements of

16   this offense?

17   A.  Yes, Your Honor.

18        THE COURT:  And would the United States Attorney

19   please set forth the factual basis for the plea, that is the

20   evidence you believe you could prove if this case were to go

21   to trial?

22        MS. STEPHAN:  Yes, Your Honor, thank you.  Beginning

23   sometime in or around 2009 and continuing until his arrest on

24   May 20th, 2014, Cody (indiscern.), even during periods of his

25   incarceration through almost all of 2010, Cody (indiscern.)

1   his program.  Cody used manipulation, including (indiscern.)
2   and promises of a better life to coerce some women and through
3   force with others.  On many occasions, Cody would
4   (indiscern.).  Women recruited into Cody's program learned his
5   rules must be obeyed.  Specific rules had an overall theme, do
6   as he commanded, make him money, do not exhibit any behavior
7   that he would qualify as disrespectful.  Cody's rules were
8   easily broken.  All women had to do was make eye contact with
9   another man in public or express a desire to leave his
10  program.  Breaking the rules typically had serious
11  consequences.  Women would be get beat, physically attacked.
12      Cody used specific terms in his prostitution business.
13  For instance, out of pocket meaning a woman was not obeying
14  his rules, (indiscern.) to describe the relationship between
15  each of the women prostitutes, and daddy referring to himself
16  as the pimp, among others.  Being out of pocket came with
17  consequences, usually in the form of physical assaults.  Among
18  many other means of force and coercion were the following.
19  Cody obtained and provided drugs for the women, including
20  prescription drugs, therefore either reducing their
21  inhibitions for fighting and set to do what they were told.
22  Cody took victim's identification and other personal property.
23  And Cody used access to a victim's child as (indiscern.).
24      Others conspired with Cody to run his program.  Cody's
25  father, referred to in the Indictment as person number 1,

1    helped recruit women for Cody's program including the victim

2    identified by the initials C.R.  A.B., referred to as person

3    number two in the Indictment, helped Cody purchase a BMW

4    vehicle that was used to promote his program, permitting Cody

5    to use her cell phone plan for his mobile telephone, provided

6    him with money and access to credit and debit cards to place

7    Backpage.com advertisements, and assisted by transporting Cody

8    and the women he recruited into his program from various

9    hotels, including from hotels in Allentown, Reading,

10   (indiscern.), and other places.

11        There are 12 women named in the Indictment representing

12   counts 3 through 15.  In support of count 3, the victim

13   referred to here as A.D.  The Defendant recruited A.D. to work

14   for him as a prostitute.  A.D. worked for the Defendant for

15   approximately four years ending on or about May 20th, 2014.

16   Defendant posted advertisements listing prostitution customers

17   on a website known as Backpage.com, set the prices for the

18   prostitution services.  The Defendant used the internet and

19   various cell phones to communicate with A.D. and customers.

20   Over the course of four years, he assaulted A.D. for not

21   making enough money, for disobeying his rules, meaning to be

22   out of pocket, for being disrespectful to him and his friends,

23   and for not wanting to work for him.  All the money made by

24   A.D. had to be turned over to the Defendant.

25        On one occasion when A.D. asked if she could keep some of

1    the money for food or cigarettes, the Defendant beat A.D.

2    repeatedly as punishment.  On another occasion, the Defendant

3    assaulted A.D., causing her to temporarily lose vision in one

4    of her eyes, for being out of pocket.  In addition, the

5    Defendant and A.D. have a child in common.  The Defendant

6    forced A.D. to give up her child in order for her to continue

7    working as a prostitute for him.  Moreover, the Defendant used

8    the child as a tool of manipulation, promising or withholding

9    visits in order for A.D. to continue to work giving

10   prostitution dates where he had all the money.  There were

11   several occasions in which A.D. tried to leave the Defendant

12   and the Defendant physically prevented her or searched for her

13   (indiscern.).  To further degrade A.D. (indiscern.), Cody

14   would strip her naked and beat her.

15        Count 4 applies to the victim referred to as C.R.  C.R.

16   originally met the Defendant's father, referred to as person

17   number 1 in the Indictment, who recruited C.R. on behalf of

18   his son.  The Defendant advertised her on Backpage.com and set

19   prices for the prostitution services.  The Defendant used the

20   internet and various cell phones to communicate with C.R. and

21   customers.  The Defendant would prostitute C.R. in Allentown,

22   Reading, Scranton, Pennsylvania, Gaithersburg, Maryland, New

23   York, New York, and many other locations.  He either

24   transported C.R. to places where he advertised her for

25   prostitution, (indiscern.) C.R. to be transported by

1    (indiscern.).  C.R. had to give all the money she earned to

2    the Defendant.

3         The Defendant was physically violent with C.R. many

4    times.  He assaulted her for talking back to him, for messing

5    with his money, or for doing something that broke one of his

6    rules.  The Defendant beat C.R. so badly that she has spots on

7    her head where hair will no longer grow from having it

8    violently ripped out by the Defendant.  In March of 2014, at

9    A.D.'s birthday, the Defendant violently beat and raped C.R.

10   in front of A.D. for being out of pocket and not following his

11   rules.  The Defendant would later state to A.D. that he took

12   it from her, meaning raping C.R., and asking A.D. if she would

13   rather have him take it from her instead.

14        On April 26th, 2014, while at a gas station, an argument

15   broke out between some of the women who worked for Cody --

16   sorry.  C.R. attempted to leave while Cody was inside the gas

17   station at the convenience store.  Once outside the vehicle,

18   one of the women yelled that C.R. was trying to leave and then

19   struck C.R.  The Defendant then punched C.R. violently, after

20   which she fell to the ground unconscious.  Four independent

21   witnesses have testified to witnessing this assault.  The

22   Defendant then threw C.R.'s bag on top of her and fled.  C.R.

23   was hospitalized.

24        Count 5 refers to the victim using the initials M.W.  The

25   Defendant contacted M.W. through a Backpage advertisement and

1    for several days attempted to recruit her.  M.W. asked

2    Defendant for a ride on a day her friend got a flat tire.  The

3    Defendant picked M.W. up and went to a hotel room.  The next

4    day Cody agreed to drive her home to an address in Scranton.

5    While driving, M.W. realized they were going south on the

6    Northeast Extension of the Pennsylvania Turnpike towards

7    Allentown and she questioned the Defendant about it.  The

8    Defendant told her she was coming with him and she was going

9    to make him money.  M.W. stressed she had to get home to her

10   daughter who was with a babysitter.  The Defendant instructed

11   her to call the babysitter and tell her she was not coming,

12   and he would give her money to pay the babysitter.

13       The Defendant advertised her on Backpage.com and took all

14   the money from the prostitution dates.  M.W. tried escaping on

15   several occasions.  On one such occasion, M.W. told the

16   Defendant she had to travel to Scranton to sign for a tax

17   refund check and she knew that the Defendant would expect for

18   her to give it all to him.  The Defendant agreed to drive her

19   for that purpose.  In route, the Defendant became aware that

20   M.W. was directing him to a residential area where M.W. was

21   hoping to get close enough to home so she could escape.  When

22   Defendant learned of her ploy, he got extremely angry, which

23   caused M.W. to flee from his moving vehicle.  M.W. ran to a

24   residence where the door was unlocked and ran inside.  The

25   homeowner was present and called 911.  The Defendant was later

1    stopped at East Strasburg, Pennsylvania area with M.W.'s

2    belongings in his vehicle.  The Defendant physically assaulted

3    M.W. on several other occasions, including slapping and

4    punching her for being out of pocket and not obeying his

5    rules.

6        Count 6 refers to the victim using the initials M.G.

7    Defendant recruited M.G. to work for the Defendant as a

8    prostitute in or around June through August of 2012.  The

9    Defendant advertised her on Backpage.com, set the prices for

10   her prostitution services, and required M.G. to give him all

11   the money she made.  The Defendant used the internet and

12   various cell phones to communicate with M.G. and customers.

13       In the two months M.G. worked for the Defendant, he was

14   violent with her about five or six times as a way of keeping

15   her compliant with the rules of his program and working for

16   him as a prostitute.  On one occasion, the Defendant took her

17   to a hotel room and beat and punched her in front of other

18   women.  On another occasion, M.G. told the Defendant she did

19   not want to get in the car with him.  The Defendant hit her

20   and dragged her by her hair into his car.  The Defendant told

21   her that he would hit her if she did anything wrong or for

22   breaking his rules.  The Defendant had her prostitute for him

23   in Allentown, Reading, and Scranton, Pennsylvania.

24       Count 7 refers to the victim referred to here as B.J.

25   The Defendant recruited B.J. to work with him as a prostitute

1    in the summer of 2012.  The Defendant posted advertisements

2    for her on Backpage.com, set prices for the prostitution

3    services, and required B.J. to give him all the money she

4    made.  The Defendant used the internet and various cell phones

5    to communicate with B.J. and customers.  He supplied B.J. with

6    cocaine to keep her awake so she could continue to work even

7    when she was tired.  On multiple occasions, the Defendant beat

8    B.J. and kicked her in the face for not working or for wanting

9    to leave.  The Defendant also assaulted B.J. for asking for

10   drugs.  The Defendant put her in a hotel bathroom and punched

11   her multiple times.

12        Count 8 applies to the victim referred to here as -- by

13   the initials N.G.  In 2002, the Defendant recruited N.G. to

14   work or prostitute for him by contacting her over

15   Backpage.com.  The Defendant lured her by promises of making

16   money and helping buy her stuff.  The Defendant posted

17   advertisements soliciting prostitution customers on

18   Backpage.com, set the prices for the prostitution services,

19   and required N.G. to give all the money she made to him.  The

20   Defendant used the internet and various cell phones to

21   communicate with N.G. and customers.

22        The Defendant physically assaulted N.G. for being out of

23   pocket.  Defendant punched her and put her head through the

24   bathroom mirror of the hotel where they were working.  After

25   about a month, she ran away from the Defendant and returned

1    home.   Approximately a year and a half later, N.G. saw the
2    Defendant and he told her he wanted her back on his team.
3    N.G. agreed, but on their way to the hotel, they got into an
4    argument.   The Defendant took her cell phone, left her in a
5    hotel room, and told her she needed to work.   N.G. had to give
6    him all of the money she earned.   When the Defendant returned
7    and argument ensued, during which the Defendant beat N.G.
8    about the face causing black eyes and put her head through bed
9    headboard.   While N.G. was crying in the bathroom, the
10   Defendant wanted to have sex with her.   When she refused, he
11   raped her.
12        In May of 2014, N.G. posted herself on Backpage.com
13   because she was in need of money.   Seeing the ad, the
14   Defendant called N.G. telling her she was his property and
15   that she owed him money.   He accused her of working with
16   another pimp and threatened to assault her.
17        Counts 9 and 15 relate to the victim identified by the
18   initials B.W.   The Defendant recruited B.W. to work as a
19   prostitute for him when she was just 17 years old.
20   (Indiscern.) that the Defendant knew the victim was 17 years
21   old because she told him.   The Defendant posted advertisements
22   soliciting prostitution customers on a website known as
23   Craigslist, set the prices for the prostitution services, and
24   required B.W. to give all the money she made to him.   The
25   Defendant used the internet and various cell phones to

1    communicate with B.W. and customers.

2         The Defendant took B.W. to New York City where he forced

3    her to walk the track on Lexington Avenue and solicit

4    prostitution dates.  B.W. became pregnant in September of 2008

5    when she was still 17, by the Defendant.  The Defendant,

6    knowing that she was pregnant, continued forcing her to

7    prostitute and assaulting her.  The Defendant was violent with

8    her on numerous occasions and left her with bruises all over

9    her body.  The Defendant assaulted her for not earning enough

10   money, stating she did not want to prostitute for him any

11   longer, and for disrespecting him.  During one assault, he

12   knocked the contact out of her eyes.  In February of 2012,

13   Defendant attempted to recruit B.W. again.  The Defendant

14   drove her around Allentown, telling her she was going to work

15   for him again.  He brought her to a hotel room and gave her

16   Xanax.  When she refused to continue to prostitute for him, he

17   stripped her naked and beat her.

18        Count 10 applies to the victim referred to here as C.W.

19   The Defendant recruited C.W. to work for him as a prostitute

20   in the summer of 2012.  Over a three day period, the Defendant

21   posted advertisements of C.W. on Backpage.com, set prices for

22   the prostitution services, and required C.W. to give him all

23   the money she made.  The Defendant used the internet and

24   various cell phones to communicate with C.W. and customers.

25   On one occasion, the Defendant violently assaulted C.W. in a

1    hotel for disrespecting him, including kicking her head while

2    she was in a fetal position on the ground.  On the third day,

3    while the Defendant was moving and two other women to a hotel

4    -- a different hotel -- C.W. jumped from the car at a traffic

5    light and ran to escape.  Defendant chased after her.  C.W.

6    jumped into a car of someone she knew who she happened to see

7    driving by and escaped.

8         Count 11 refers to the victim using the initials E.B.  In

9    December of 2012, the Defendant recruited E.B. to work as a

10   prostitute for him by contacting her on Facebook.  The

11   Defendant lured her with promises of making money and having a

12   relationship.  The Defendant posted advertisements, soliciting

13   prostitution customers on Backpage.com, set the prices for the

14   prostitution services, and required her to give him all the

15   money she made.  The Defendant used the internet and various

16   cell phones to communicate with E.B. and customers.  During

17   the time E.B. worked for the Defendant, she had (indiscern.)

18   on A.D.  Defendant also threatened E.B. repeatedly if she

19   tried to leave, he would find her and beat her.  The Defendant

20   also provided E.B. with cocaine and pills to keep her working

21   longer hours.

22        Count 12 applies to the victim referred to with initials

23   A.M.  The Defendant recruited A.M. to work as a prostitute for

24   him through a friend.  The Defendant posted advertisements

25   soliciting prostitution customers on Backpage.com, set prices

1    for the prostitution services, and required A.M. to give her

2    all the money she made.  Defendant used the internet and

3    various cell phones to communicate with A.M. and customers.

4    Defendant assaulted A.M. on various numerous occasions,

5    including after a time when she asked him who his (indiscern.)

6    was?  On another occasion, after A.M. was arrested for

7    prostitution in Harrisburg for the Defendant, he severely beat

8    her and kicked her in the face, leaving her unconscious in a

9    hotel room.

10        Count 13 refers to a victim referred to as R.E.

11    Defendant recruited R.E. after finding her on Backpage.com in

12    Baltimore, Maryland.  Defendant set up a date with her, then

13    recruited her to work for him.  Defendant prostituted R.E. for

14    four months in early 2013.  The Defendant posted

15    advertisements soliciting prostitution customers on

16    Backpage.com, set the prices for the prostitution services,

17    and required R.E. to give him all the money she made.  The

18    Defendant used the internet and various cell phones to

19    communicate with R.E. and customers.  The Defendant told R.E.

20    repeatedly that she could not leave and there would be

21    problems if she did.  R.E. saw the Defendant physically strike

22    other women.  Because the Defendant was so violent, R.E.

23    started hiding money to prepare to make an escape.  The

24    Defendant found out, violently beat her, and took her money.

25        Count 14 applies to the victim referred to the victim

1    referred to as K.M.  K.M. stated she was kidnapped by the

2    Defendant in Hershey, Pennsylvania, initially taken to a hotel

3    in Martinsville, Pennsylvania and expected to work for the

4    Defendant as a prostitute.  Defendant forced her to work and

5    took all the money.  Defendant told her that if she refused,

6    they were going to have problems.  The Defendant posted

7    advertisements of K.M. on Backpage.com, set the prices for the

8    prostitution services, required K.M. to give all the money she

9    made to him.  The Defendant used the internet and various cell

10   phones to communicate with K.M. and customers.

11        After two days she managed to find a ride home and left

12   (indiscern.) for fear Defendant finding out.  The Defendant

13   had taken K.M.'s driver's licence, and using that, found her,

14   called her, and warned her that he would come and find her.

15   After a short time, he tracked her down in New York and told

16   her they would have problems if she refused to work for him

17   and come with him.  K.M. had observed him assault other women,

18   so she went with him out of fear.  The Defendant brought her

19   back to Allentown area, prostituted her once again taking all

20   the money she earned.

21        If this case proceeds to trial, there would have been

22   numerous additional witnesses who have testified in addition

23   to the 12 women already outlined.  For example, witnesses

24   referred to here as A.G. and T.R. would have testified to

25   observing Cody physically assault A.D. when she refused to go

1   with him as instructed.  D.W. would have testified that

2   Defendant admitted to him that he ran a prostitution business

3   by force and would whip the women's asses for not complying,

4   among other statements.  F.C. would have testified that F.W.

5   ran into her home very afraid and upset, stating in exciting

6   utterances that she had been kidnapped.  Various witnesses,

7   including police officers, who have testified of seeing

8   bruises and injuries on many of the victims.  Thank you, Your

9   Honor.

10            THE COURT:  Thank you very much, Counselor.

11   BY THE COURT:

12   Q.  Mr. Cody, did you hear everything the Assistant United

13   States Attorney had to say concerning the factual basis for

14   these pleas?

15   A.  Yes, Your Honor.

16   Q.  And did you also -- were you able to follow along there in

17   the Government's Sentencing Memorandum -- or the Government's

18   Plea Memorandum as well?

19   A.  Yes, Your Honor.

20   Q.  Sir, do you fully admit that all of those facts are true

21   and correct?

22   A.  Yes, Your Honor.

23   Q.  Do you wish to contest, add, or modify any of the facts

24   set forth by the U.S. Attorney?

25   A.  No, Your Honor.

```
1    Q.  And, sir, do you fully admit that those facts meet the
2    elements of the offenses to which you are pleading guilty?
3    A.  Yes, Your Honor.
4    Q.  In other words, that you are, in fact, guilty of these
5    offenses based on having committed those acts?
6    A.  Yes, Your Honor.
7    Q.  Do you have any questions for me at this point, sir?
8    A.  No, Your Honor.
9         THE COURT:  Do counsel have any other questions that
10   you would like me to ask of the Defendant?  Ms. Stephan?
11        MS. STEPHAN:  No, Your Honor.
12        MS. HENRY:  No, Your Honor.
13   BY THE COURT:
14   Q.  Now, sir, do you believe you fully understand the elements
15   of each one of these offenses?
16   A.  Yes, Your Honor.
17   Q.  And do you admit that your conduct meets the elements of
18   each one of these offenses?
19   A.  Yes.
20   Q.  And, sir, do you also understand the maximum sentence that
21   could be imposed, as well as the mandatory minimum sentences?
22   A.  Yes, Your Honor.
23   Q.  Do you also understand the Plea Agreement?
24   A.  Yes.
25   Q.  And do you understand the sentence that if I impose,
```

1   pursuant to the Plea Agreement, that you would be prohibited

2   from filing an appeal from that and the case would be over

3   with, you understand that?

4   A.  Yes, Judge.

5   Q.  And do you also understand that whole idea of you waiving

6   your appellate rights, that there would be no review of the

7   sentence I impose by any further Court.  It would be final and

8   over.  Do you understand that?

9   A.  Yes, Your Honor.

10  Q.  And you want to be bound by that?

11  A.  Yes, sir.

12  Q.  And do you fully understand all the rights you're giving

13  up by pleading guilty, including the right to a trial?

14  A.  Yes, Your Honor.

15  Q.  There will not be a trial of any sort in this case if I

16  accept the terms of the Plea Agreement and impose a sentence

17  in accordance with that agreement.  Do you understand that?

18  A.  Yes, Judge.

19  Q.  Do you have any questions at all?

20  A.  No, Your Honor.

21  Q.  Are you prepared to enter your plea at this time?

22  A.  Yes, Your Honor.

23  Q.  Very well, sir.  If you would please stand.  Corderro

24  Cody, you have been charged in the Second Superceding

25  Indictment #14-583 with one count of conspiracy to commit sex

1   trafficking by fraud -- by force, fraud, or coercion in

2   violation of Title 18 United States Code Section 1594(c) with

3   one count of conspiracy to transport individuals interstate to

4   engage in prostitution in violation of Title 18 United States

5   Code Section 371 with 12 counts of sex trafficking by force,

6   fraud, or coercion in violation of Title 18 United States Code

7   Sections 1591(a) and 1594 and with one count of sex

8   trafficking of a minor in violation of Title 18 United States

9   Code Sections 1591(a) and 1594.  Sir, how do you plead now to

10  these charges, guilty or not guilty?

11  A.  Guilty.

12          THE COURT:  Very well.  You may be seated, sir.  The

13  Court makes the following finding, that the Defendant is fully

14  alert, competent, and capable of entering an informed plea and

15  that this plea is a knowing and voluntary plea supported by an

16  independent basis in fact, containing each of the essential

17  elements of the offenses plead to.  I also find that the

18  Defendant's waivers of his direct and collateral appeal rights

19  were entered into knowingly and voluntarily and that their

20  enforcement does not work a miscarriage of justice.

21          Accordingly, Defendant's pleas of guilty are therefore

22  accepted and he is now adjudged guilty of the offenses.  A

23  Pre-sentence Report shall be prepared by the Probation Office

24  and the Defendant will be required to give information to

25  assist that officer in his preparation.  The Defendant may

1    have counsel present while answering any questions.  Both

2    Defendant and Defense counsel shall sit down face to face and

3    review the Pre-sentence Report when it is completed.

4    Defendant shall immediately notify counsel of any objections,

5    and counsel shall notify the probation officer of any

6    objections within 14 days of receipt of the report as required

7    in the Federal Rule of Criminal Procedure 32(f)(1).

8            Counsel, I was intending to schedule sentencing for

9    Friday, January 29, 2016 at 1:00 p.m. here in Easton.  Is that

10   date appropriate for all counsel and as far as you know,

11   Attorney Stephan, I understand you have notified the victims

12   of today's hearing.  Do you have any reason that date wouldn't

13   be appropriate for the victims as well?

14           MS. STEPHAN:  It's perfect for the Government, Your

15   Honor, and we have no reason to believe that (indiscern.).

16           THE COURT:  And Attorney Henry and Attorney Meehan?

17           UNIDENTIFIED SPEAKER:  That's fine with us, Your

18   Honor.

19           THE COURT:  Very well.  Sentencing is scheduled for

20   Friday, January 29, 2016 at 1:00 p.m. here in the Easton

21   Courthouse.  Mr. Cody, your counsel will assist you in

22   preparing for sentencing, but you certainly have the right to

23   present anything you believe would be of assist to the Court

24   in tailoring an appropriate sentence.  Do you have any

25   questions at all, sir?

1           THE WITNESS:  No, Your Honor.

2           THE COURT:  Counsel, anything further before we

3    adjourn?

4           MS. STEPHAN:  No, Your Honor.

5           MS. MEEHAN:  Your Honor, may we have one moment with

6    the U.S. Attorney?

7           THE COURT:  Certainly.

8           MS. HENRY:  Your Honor, we had previously -- Your

9    Honor had previously ordered that Mr. Cordello would only be

10   permitted visits by his counsel.  We're asking, and the

11   Government isn't opposing, allowing his mother to visit him in

12   advance of sentencing.  We could submit the proposed Order to

13   the Court.

14          THE COURT:  Right and there's no objection from the

15   United States?

16          MS. STEPHAN:  No, Your Honor.

17          THE COURT:  Then I will permit his parents to visit

18   him.

19          MS. HENRY:  Thank you, Your Honor.

20          THE COURT:  You're welcome.  And nothing further,

21   counsel?  And Mr. Cody, you have no further questions?

22          THE WITNESS:  No, Your Honor.

23          THE COURT:  Very well.  This matter is adjourned.

24   The Defendant is remitted back to the custody of the U.S.

25   Marshals.

67

1            ALL:  Thank you, Your Honor.

2            THE CLERK:  All rise.

3        (Court adjourned)

4

5                        CERTIFICATION
6    I certify that the foregoing is a correct transcript from the
7    electronic sound recording of the proceedings in the above-
8    entitled matter.
9
10
11   _Lewis Parham_                        1/13/16
12
13   _____      _____
14   Signature of Transcriber                  Date